## John W. Harrison v. The State.

### No. 2313.   Decided June 24, 1902.

**1.—Continuance.**

A continuance will not be granted where the facts expected to be proved are too generally stated, and are conclusions of the witnesses, and not the statement of the facts they would testify to.

**2.—Same—Insanity—Nonexpert Witness.**

An application for continuance for absent nonexpert witnesses, to prove insanity of accused, to be sufficient, must show the matters and things upon which the said witnesses predicated their opinion that the accused is insane.

**3.—Bigamy—Moral Insanity.**

On a trial for bigamy, where the defense was moral insanity, Held, no perversion of the moral affections and propensities, unless accompanied by such delusion as indicates the subversion of the will and reason, is to be regarded as insanity in law.

**4.—Insanity No Defense, When.**

A party who is indicted is not entitled to be acquitted on the ground of insanity if, at the time of the alleged offense, he had capacity and reason sufficient to enable him to distinguish between right and wrong, and understood the nature, character and consequences of his act; and had sufficient mental power to apply that knowledge to his own act. If, at the time of committing the act the party had reason and understanding sufficient to enable him to understand that his act was forbidden by law, and that the law directed that the person who did such act should be punished, he is responsible.

Henderson, Judge, dissenting, holds that from the facts in evidence the appellant was insane with delusions at the time of his second marriage.

Appeal from the District Court of McLennan.   Tried below before Hon. Sam R. Scott.

Appeal from a conviction of bigamy; penalty, four years imprisonment in the penitentiary.

The opinion states the evidence.

No brief on file for appellant.

*Rob't A. John,* Assistant Attorney-General, for the State.

DAVIDSON, Judge.—Appellant was convicted of bigamy and given four years in the penitentiary.

He reserved an exception to the overruling of his application to continue on account of the absence of T. W. Atkinson and Mrs. Ella Atkinson, residents of Hill County, by whom he expected to prove they were acquainted with him during the year 1901, and prior thereto; knew his habits and mental condition; and that during the time of their acquaintance with him he was insane and incapable of judging between right and wrong with respect to the matters with which he stands charged; that during the time mentioned he was afflicted with partial insanity on the subject of religion and marriage; and at the time of his second marriage he was incapable of realizing that it was wrong for him to marry the second time. He further alleged there were no other

witnesses by whom he could prove these facts fully and accurately. As was said in Shirley v. State, 37 Texas Crim. Rep., 475, the facts expected to be proved are too generally stated; they are simply conclusions. These witnesses are nonexperts; and the matters and things upon which they are supposed to base their conclusion or belief as to appellant's insanity are not stated. No word, act or deed is stated, nor any fact given as a predicate for their opinion that he was insane. This identical question was passed on in Davis v. State, at the present term, adversely to appellant, and in harmony with the Shirley case, supra. The court did not err in overruling the application for continuance.

It was further contended the testimony is not sufficient to support the finding of the jury. Mrs. Sovey, who was appellant's second wife, testified that she knew appellant had another living wife at the time she married him; that he informed her such was the fact. She further stated: "I knew that Mr. Harrison and myself were both doing no wrong as we had both gone to God and prayed over the matter. He told us that Mr. Harrison's first marriage was wrong in the sight of God, and that he would do no wrong in getting married." Appellant took the stand, and stated that he married Mrs. Earl and lived with her about a year. He stated that he was a minister of the gospel, and believed it was right for him to leave his first wife and marry the second one; that God had informed him that he could not pursue his work as a minister successfully as long as he lived with this woman. He did not procure a divorce, as it was not necessary, as God told him in a vision that it would not be wrong for him to marry the second time without getting the divorce. That God came to him in visions, and whatever He commanded him to do, he did it, regardless of consequences. That when God commanded him to do a thing, no matter what the law was with which it came in conflict, he would do it, regarding the law of God as superior to the law of man. He denied being crazy, and asserted that he was not trying to play crazy; that in his ministerial work he had always obeyed the command of God, and that God had wonderfully blessed his work; that he had sixty conversions within the last few days, etc. That he knew the laws of Texas required the marriage ceremony; that a second marriage without divorce was against the law, and a penitentiary offense. He knew it was wrong, according to human laws, but acted under divine guidance.

Dr. Howard testified that he knew defendant; saw him in the county jail; observed his actions and talked with him, and heard his testimony; that he was insane; that he did not believe he was able to distinguish between the right and wrong with regard to the crime of bigamy. "I think he has what is known as religious insanity, or in other words, emotional insanity." He gave it as his opinion that appellant was not capable of judging between right and wrong in marrying the second wife while his first wife was alive; that a man whose mind was in such diseased condition that he believed he had personal revelation from God and visions directing him in important undertak-

ings, and these delusions continued in waking hours as real to him, and such condition continued through a space of years, would not in his opinion be capable of judging between the right and wrong in regard to any action closely connected with such delusions.

Dr. Walker testified that he saw defendant in the county jail a few weeks before the trial. He seemed to be suffering under some delusion caused by starvation or indigestion.

Walker, a farmer, testified that he lived close neighbor to defendant since his marriage with Mrs. Sovey, his second wife; that he had no particular dealings with him, but had frequently been in his company; had often heard him preach, and in his opinion appellant was of sound mind and knew right from wrong. Such delusion and visions as defendant seemed to have could have been caused by either starvation or indigestion. He expressed the opinion that if such condition continued through a term of years and the party believed while awake as well as in his dreams, that he had personal conversations with God, and God advised him in all important undertakings, and was in the habit of going down on his face before the Lord, and that such visions seemed to be real to him and were frequent, such a man would not be responsible.

Costley testified that he was the jailer who had Harrison in charge while confined, and watched him closely. He did not think appellant crazy, but thought he was "nutty" on the subject of religion; that he was continually shouting and preaching and seemed to be laboring under the delusion that he was converting large numbers of people. He did not know whether appellant fasted twenty days, except from what other prisoners in the jail told him; that he did not know from a scientific standpoint whether or not appellant was crazy. This is the substance of the testimony found in the record.

The evidence of these witnesses who testify to their belief that he was insane confine it to the issue of moral insanity—moral insanity reaching the point of irresistible impulse. If the party could distinguish between the right and wrong of the act he was doing, it is not a defense to the act which would otherwise be criminal. Mr. Bushwell says: "It seems that evidence as to a party's religious, political or moral beliefs, if unsupported by other testimony, will not generally be admitted to prove his insanity." Bushw. on Insanity, sec. 210. The same author says, section 10: "No perversion of the moral affections and propensities, unless accompanied by such delusion as indicates the subversion of the will and reason, is to be regarded as constituting insanity in law. This moral insanity, or the perversity of the moral feelings, is of itself insufficient to invalidate the civil act, or excuse the criminal act, of its subject." This author cites Flannigan v. People, 52 N. Y., 457, which contains the doctrine, "that the law does not recognize the form of insanity in which the capacity of distinguishing between right and wrong exists, without the power of choosing between them." Again, Mr. Bushwell, following McNaughten's case, section 437, says, "that a party who is indicted is not entitled to acquittal on the ground of insanity if at the

time of the alleged offense he had capacity , and reason sufficient to enable him to distinguish between right and wrong, and understood the nature, character and consequences of his act, and had mental power sufficient to apply that knowledge to his own act." In the same work, section 435, this language is found: "If the party had at the time of the commission of the act such degree of reason and understanding as is sufficient to enable him to understand that his act was forbidden by law, and that the law directed that the person who did such act should be punished, he is responsible." See also Cannon v. State, 41 Texas Crim. Rep., 467; Leach v. State, 22 Texas Crim. App., 279. Under the authorities, and the rule in regard to the questions involved in this case, appellant evidently knew it was wrong to marry the second time; he knew it was in violation of law to marry without a divorce. If appellant's contention becomes the law of this State, the sacrament of plural marriages of the Mormon church would exempt from punishment all the disciples of Brigham Young and Joseph Smith who practiced polygamy in this State.

We are of opinion that the verdict of the jury is correct, and the judgment is in all things affirmed.

*Affirmed.*

HENDERSON, JUDGE.—(Dissenting).—If this case could be sustained at all on the facts, it would be on the testimony of appellant himself. All the other witnesses, as I understand the record, testify that he is crazy. Walker, the nonexpert, states, that while he believes appellant knew right from wrong, further states, on the hypothetical case put to him, that a man troubled with such delusions would not be responsible for his actions. Costley, the jailer, says that he noticed him closely while in jail; that he did not consider him crazy, but "nutty" on the subject of religion; that he was continually preaching and shouting, and seemed to be laboring under the delusion that he was converting large numbers of people all the time. He did not know whether appellant fasted twenty days or not, except what was told him by the other prisoners. Dr. Howard testified, as a physician and expert, that he had made a personal examination of the defendant; had observed his actions, saw him and talked with him, and heard his testimony delivered in court, and that in his opinion appellant was insane; that his insanity was of such a kind that he would not be able to distinguish between right and wrong with regard to the crime of bigamy; that he did not think at the present time, nor at the time he saw him in the county jail, that appellant was capable of judging between right and wrong in marrying his second wife while his first wife was still alive, or of knowing that such action was illegal. A man whose mind was in such a diseased condition that he believed he had personal revelations from God in visions, directing him in all of his important undertakings, and such delusions continued in his waking hours as well as in his sleeping state, and were real to him, and such conditions continued

through a space of years, would not be capable of judging between right and wrong in regard to any action closely connected with such delusions. As stated above, all the witnesses tend to show that appellant was suffering under a diseased state of mind, and that Dr. Walker, who was the most reliable because he knew what he was testifying about, shows beyond any reasonable doubt, that appellant was suffering under a delusion which rendered him irresponsible and incapable of distinguishing between right and wrong in regard to the crime of bigamy. But, as stated, if we are to rely on appellant's testimony, to the exclusion of the other sane witnesses, this case may be affirmed, because he declared he was not crazy, but had as much sense as any man in the courtroom. However, it occurs to me that his testimony would suggest that the defense here set up was not a pretext or subterfuge. I do not believe that it was a question of emotional insanity, though Dr. Walker called his delusions religious or emotional insanity. As testified by him, appellant did not know the difference between right and wrong with regard to the crime of bigamy, and this was the result of a delusion caused by an insane mind. This comes within the strict test as laid down by our own authorities on the subject of insanity. Of course, appellant says he knew it was wrong to marry the second time; that he knew it was a violation of law to marry without a divorce, but if there is any meaning in the testimony of the other witnesses, especially of Dr. Walker, this is simply the raving of a crazy man. Nor do I believe, if the views here insisted on become the law of the land, there is any danger of mormonizing the people of this State. The Mormons seem to have derived their religion from the Old Testament, in part at least, and plural marriages is, or was, a part of their creed, but has never been considered the result of insane delusions. Nor do I know that any one has ever charged Brigham Young or Joseph Smith with being lunatics. The simple question here presented from the evidence is, was appellant, at the time of his second marriage, laboring under such a delusion as not to know the difference between the right and wrong of the act of bigamy, and was this delusion caused by a diseased mind, which unsettled his faculties to such an extent that he did not know it was wrong, both according to the laws of God and man to marry, having another wife then living? That the evidence established that such was his condition of mind I do not entertain any doubt. I do not believe the penitentiary is the place for him, but rather the lunatic asylum.